**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PRATCHI ROY, derivatively on behalf of KYNDRYL HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MARTIN SCHROETER, DAVID B. WYSHNER, VINEET KHURANA, DOMINIC J. CARUSO, JOHN D. HARRIS II, STEPHEN A.M. HESTER, SHIRLEY ANN JACKSON, JANINA KUGEL, DENIS MACHUEL, RAHUL N. MERCHANT, JANA SCHREUDER, and HOWARD I. UNGERLEIDER, <br><br> Defendants, <br><br> and <br><br> KYNDRYL HOLDINGS, INC., <br><br> Nominal Defendant. | Case No.: 1:26-cv-02840 <br><br> **DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Pratchi Roy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Kyndryl Holdings, Inc. ("Kyndryl" or the "Company"), files this Verified Shareholder Derivative Complaint against Martin Schroeter ("Schroeter"), David B. Wyshner ("Wyshner"), Vineet Khurana ("Khurana"), Dominic J. Caruso ("Caruso"), John D. Harris II ("Harris"), Stephan A.M. Hester ("Hester"), Shirley Ann Jackson ("Jackson"), Janina Kugel ("Kugel"), Denis Machuel ("Machuel"), Rahul N. Merchant ("Merchant"), Jana Schreuder ("Schreuder"), and Howard I. Ungerleider ("Ungerleider") (collectively, the "Individual

1

Defendants," and together with Kyndryl, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Kyndryl, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 10(b), 14(a), and 20(a) of Securities Exchange Act of 1934 (the "Exchange Act"), as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Schroeter, Wyshner, and Khurana. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Kyndryl, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Kyndryl's directors and officers from August 1, 2024, through February 9, 2026, inclusive (the "Relevant Period").

2.      Kyndryl is a Delaware Corporation with its principal executive offices located in New York, New York. The Company is chiefly engaged in the information technology ("IT") industry. The Company was founded in 2021 when its former parent company, International Business Machines Corporation ("IBM"), spun off its infrastructure services unit of its Global Technology Services segment. The Company provides cloud services, data and artificial

intelligence services, security, services, and digital workplace services, among others, to its large customer base.

3.     Throughout the Relevant Period, the Individual Defendants minimized ongoing issues and inadequacies in the Company's internal controls and its effects subsequent effects on the Company's financial reporting.

4.     The truth fully emerged on February 9, 2026, when the Company filed a Notification of Late Filing with the SEC, announcing that it was unable to file its quarterly report for the period ending on December 31, 2025, on time. In this Notification of Late Filing, the Company also disclosed that it "anticipates reporting material weaknesses in the Company's internal control over financial reporting" for the several reporting periods including, the 2025 Fiscal Year[1] and the first two quarters of the 2026 Fiscal Year.

5.     On this news, the price of the Company's common stock dropped $12.90 or approximately 54.9%, from a closing price of $23.49 per share on February 6, 2026, to a closing price of $10.59 per share on February 9, 2026.

6.     In breach of their fiduciary duties, the Individual Defendants caused and/or permitted Kyndryl to participate in the systematic manipulation of cash flow metrics due to the lack of transparency with cash management practices which included the deferment of vender payments quarter to quarter (the "Cash Flow Metrics Misconduct"). On February 17, 2026, the Company filed a Form 10-Q for the period ended on December 31, 2025 ("Q3 2026 10-Q") with the SEC that elaborates on the Cash Flow Metrics Misconduct, providing in pertinent part:

---

[1] The Company's fiscal year does not follow the calendar year but instead runs from April 1 through March 31.
For the fiscal year from April 1, 2024-March 31, 2025, the "2025 Fiscal Year."
For the fiscal year from April 1, 2025-March 31, 2026, the "2026 Fiscal Year."

The Company identified the following material weaknesses in its internal control over financial reporting:

- The Company's senior finance executives failed to set an appropriate tone at the top based on the principles associated with the control environment component of the COSO framework. ***Specifically, there was a lack of transparency with the Company's Chief Executive Officer, the Audit Committee of the Board of Directors (the "Board") and the Board, such that disclosure processes, including with respect to certain cash management practices regarding deferring vendor payments quarter to quarter, were impacted.*** Additionally, the Company lacked an appropriate complement of finance personnel with sufficient understanding of their responsibilities as Disclosure Committee members and with adequate competency in their responsibilities regarding disclosure controls.

- ***The Company did not design and maintain effective controls related to the information and communication component of the COSO framework to ensure appropriate communication pertaining to the disclosure process between certain functions within the Company***, including the Company's Disclosure Committee and the Chief Executive Officer, as well as with the Audit Committee and the Board.

- The aforementioned material weaknesses contributed to an additional material weakness. ***The Company did not design and maintain effective controls regarding the internal investigation, escalation and documentation of complaints made through the Company's reporting hotline*** and certain other available reporting channels, including with respect to appropriate escalation of certain complaints to the Audit Committee.[2]

7.     Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements and failed to disclose that: (1) the Company's financial statements and free cash flow metrics were inaccurate; (2) the sustainability of the Company's financial growth was overstated; (3) the Individual Defendants caused the Company to engage in the Cash Flow Metrics Misconduct; (4) as a result, the Company's financial condition and prospects were materially worse than represented; (5) the Company lacked adequate internal controls; and (6) as a result of the foregoing, the Company would be unable to file its Form 10-Q for the period ended

---

[2] Unless stated otherwise, all emphasis herein is added.

on December 31, 2025. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

8. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

9. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to maintain adequate internal controls while Defendant Khurana engaged in improper insider sales, netting total proceeds of approximately $3.6 million.

10. The Individual Defendants further breached their fiduciary duties by causing Kyndryl to repurchase its own stock at artificially inflated rates. Indeed, between November 2024 and December 2025, approximately 11 million shares of Kyndryl common stock were repurchased, costing the Company approximately $349.1 million. Since the repurchased stock was only worth $10.59 per share, which was the adjusted price at close of trading on February 9. 2026, Kyndryl overpaid for repurchases of its own common stock by over $232.7 million.

11. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO") and its former Senior Vice President, Global Controller and Principal Accounting Officer, to a federal securities fraud class action lawsuit in the United States District Court for the Eastern District of New York (the "EDNY Class Action") and a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "SDNY Class Action") (collectively, the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly

overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the Defendants Schroeter, Wyshner, and Khurana's liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b)), SEC Rule 10b-5 (17 C.F.R §240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. §78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

17.     Plaintiff is a current shareholder of Kyndryl. Plaintiff has continuously held shares of Kyndryl common stock at all relevant times.

### Nominal Defendant Kyndryl

18.     Kyndryl is a Delaware corporation with principal executive offices at One Vanderbilt Avenue, 15th Floor, New York, New York 10017. Kyndryl common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "KD."

### Defendant Schroeter

19.     Defendant Schroeter has served as the Company's CEO, and as Chairman of the Board since 2021.

20.     The Schedule 14A filed by the Company with the SEC on June 16, 2025 (the "2025 Proxy Statement") stated the following about Defendant Schroeter:

> ***Mr. Schroeter*** was named the first chief executive officer of Kyndryl in 2021. Previously, Mr. Schroeter served in a variety of business line and finance executive positions at IBM including senior vice president of global markets from 2018 until 2020, responsible for IBM's global sales, customer relationships and satisfaction and worldwide geographic operations and overseeing IBM's marketing and communication functions and building IBM's brand and reputation globally, and senior vice president and chief financial officer from 2014 until 2017, leading IBM's finance function.

Earlier in his career, Mr. Schroeter served as general manager of IBM global financing, managing a total asset base in excess of $37 billion, and had served in numerous roles in Japan, the United States and Australia.

Mr. Schroeter is a member of the Business Roundtable, the Business Council, the Council on Foreign Relations, and U.S.-India CEO Forum.

**Defendant Wyshner**

21.     Defendant Wyshner served as the Company's CFO from September 2021 to February 2026.

**Defendant Khurana**

22.     Defendant Khurana has served as the Company's Senior Vice President of Business Operations since February 2026. Prior to assuming this role, he served as the Company's Former Senior Vice President, Global Controller, and Principal Accounting Officer from 2021 to February 2026.

23.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Khurana made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| February 6, 2025 | 900 | $42.37 | $38,133 |
| February 6, 2025 | 800 | $42.44 | $33,952 |
| February 6, 2025 | 4,050 | $42.57 | $172,428 |
| February 6, 2025 | 3,118 | $42.64 | $132,944 |
| February 6, 2025 | 5,845 | $42.74 | $249,821 |
| February 6, 2025 | 6,890 | $42.85 | $295,211 |
| February 6, 2025 | 12,807 | $42.95 | $550,031 |
| February 6, 2025 | 7,584 | $43.03 | $326,371 |

| February 6, 2025 | 1,800 | $43.15 | $77,662. |
|---|---|---|---|
| February 6, 2025 | 206 | $43.23 | $8,906 |
| February 6, 2025 | 11,465 | $42.65 | $489,032 |
| June 2, 2025 | 2,376 | $39.07 | $92,825 |
| June 2, 2025 | 22,272 | $39.15 | $871,835 |
| June 2, 2025 | 1,803 | $39.21 | $70,699 |
| December 5, 2025 | 6,641 | $26.69 | $177,276 |

Thus, in total, before the fraud was exposed, Defendant Khurana sold 88,557 shares of Company stock on inside information, for which he received approximately $3.6 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Caruso**

24.    Defendant Caruso has served as a Company director since 2021. He also serves as Chair of the Audit Committee.

25.    The 2025 Proxy Statement states the following about Defendant Caruso:

*Mr. Caruso* served as the executive vice president and chief financial officer of Johnson & Johnson from 2007 until his retirement in 2018. Earlier in his career, Mr. Caruso served Centocor, Inc. as vice president, finance and chief financial officer from 1994 to 1998, and as senior vice president and chief financial officer from 1998 until the acquisition of Centocor by Johnson & Johnson in 1999. Mr. Caruso then joined Johnson & Johnson and served in various executive positions until his appointment as the executive vice president and chief financial officer in 2007. Mr. Caruso is a director of McKesson Corporation.

Mr. Caruso previously served as the co-chair of the U.S. Chamber of Commerce Global Initiative on Health and the Economy and currently serves on the Board of

Trustees of the Cystic Fibrosis Foundation. Mr. Caruso is trustee emeritus of the Children's Hospital of Philadelphia.

**Defendant Harris**

26.    Defendant Harris has served as a Company director since 2021 and serves as a member of the Nominating and Governance Committee.

27.    The 2025 Proxy Statement states the following about Defendant Harris:

*Mr. Harris* served as chief executive officer of Raytheon International Inc. from 2013 until 2020, where he led significant business transformations. Mr. Harris also served as vice president of business development for Raytheon Company during his tenure, a global technology and innovation-driven company with offerings such as intelligence services and cybersecurity solutions. Mr. Harris joined Raytheon in 1983 and held positions of increasing responsibility, including vice president of operations and contracts for Raytheon's former electronic systems business, vice president of contracts for the company's government and defense businesses until 2003 and vice president of contracts and supply chain for Raytheon Company until 2010, when he was named president of the Raytheon Technical Services Company, a role he served in until 2013.

Mr. Harris served on the RTCA NextGen Advisory Committee, the National Advisory Council on Minority Business Enterprise with the U.S. Department of Commerce and the Association of the United States Army's Council of Trustees. Mr. Harris serves as a board member for Cisco Systems Inc., Flex Ltd., and Exxon Mobil Corporation.

**Defendant Hester**

28.    Defendant McLoughlin has served as the Company's Lead Independent Director since 2021. He also serves as Chair of the Nominating and Governance Committee.

29.    The 2025 Proxy Statement states the following about Defendant Hester:

*Sir Stephen Hester* currently serves as chairman of easyJet plc and as chairman of Nordea Bank Abp. In 2024, he was knighted for services to business and to the economy in the United Kingdom's New Year Honours list.
Sir Stephen Hester served as chief executive officer of RSA Insurance Group from 2014 until his retirement in June 2021. Prior to joining RSA, he was group chief executive of Royal Bank of Scotland from 2008 to 2013, chief executive of British Land plc from 2004 to 2008, and chief operating officer and chief financial officer of Abbey National plc from 2002 to 2004.

10

Sir Stephen Hester began his career at Credit Suisse First Boston in 1982 and held positions of increasing responsibility, including chief financial officer and global head of the fixed income division. Additionally, during the past five years, he served as senior independent director of Centrica plc and as a director of RSA Insurance Group plc.

**Defendant Jackson**

30.    Defendant Jackson has served as a Company director since 2021. She also serves as a member of the Nominating and Governance Committee.

31.    The 2025 Proxy Statement states the following about Defendant Jackson:

***Dr. Jackson*** was a theoretical physicist at the former AT&T Bell Laboratories from 1976 to 1991, consultant to the former AT&T Bell Laboratories from 1991 to 1995, professor of theoretical physics at Rutgers University from 1991 to 1995 and chairwoman of the U.S. Nuclear Regulatory Commission from 1995 to 1999. Dr. Jackson was president of Rensselaer Polytechnic Institute for more than two decades, from 1999 until her retirement in 2022.

Dr. Jackson's distinguished career in science and technology includes being a member of the Defense Science Board and the International Security Advisory Board to the United States Secretary of State. She has also served as co-chair of the President's Intelligence Advisory Board. Dr. Jackson is a fellow of the Royal Academy of Engineering (U.K.), the American Academy of Arts and Sciences, the American Association for the Advancement of Science and the American Physical Society. She is a member of the U.S. National Academy of Engineering and the American Philosophical Society. Dr. Jackson is a recipient of the National Medal of Science, the highest award in science and engineering awarded by the U.S. Government. Dr. Jackson is currently a member of the Memorial Sloan Kettering Cancer Center Board of Trustees. Dr. Jackson is a member of the Council on Foreign Relations, and a lifetime trustee of the Brookings Institution. Dr. Jackson is also a Regent Emerita and former Vice-Chair of the Board of Regents of the Smithsonian Institution, and a past president of the American Association for the Advancement of Sciences. Additionally, during the past five years, she served as a director of FedEx Corporation and PSEG.

**Defendant Kugel**

32.    Defendant Kugel has served as a Company director since 2021. She also serves as a member of the Compensation and Human Capital Committee.

33.    The 2025 Proxy Statement states the following about Defendant Kugel:

11

*Ms. Kugel* served as the chief human resources officer and member of the managing board of Siemens AG from 2015 until 2020. Ms. Kugel joined Siemens AG in 2001 as vice president of group strategy in the communications sector and in 2005, was appointed director of global commercial excellence before becoming director of human resources in 2009. In 2012, Ms. Kugel joined Osram where she served as chief human resources officer until 2013, when she returned to Siemens AG to serve as corporate vice president of human resources and chief diversity officer.

Ms. Kugel currently serves as chairwoman of Seatti GmbH, a leading desk booking software company.

Ms. Kugel serves on the Board of, and is the co-chair of, the Digital Council of the Confederation of German Employers' Associations (Bundesvereinigung der Deutschen Arbeitgeberverbände).

Ms. Kugel is a director of TUI AG. Ms. Kugel is also a member of the International Advisory Board of the IESE Business School in Spain, the University Council of the Technical University of Munich and the Global Navigation Board of the University of Tokyo. Ms. Kugel is a senior advisor for Boston Consulting Group, Inc. and previously served as senior advisor to EQT, AB Group. Ms. Kugel is also a member of the Board of Trustees of Deutsche AIDS Stiftung ("German AIDS Foundation").

**Defendant Machuel**

34.    Defendant Machuel has served as a Company director since 2021. He also serves as a member of the Audit Committee and is classified as a Financial Expert.

35.    The 2025 Proxy Statement states the following about Defendant Machuel:

*Mr. Machuel* has served as chief executive officer of The Adecco Group since 2022. Prior to this, Mr. Machuel served as the chief executive officer of Sodexo S.A. from 2018 until 2021. Mr. Machuel joined Sodexo in 2007 as the managing director of benefits and rewards services for central and eastern Europe. In 2012, he became chief executive officer of Sodexo benefits and rewards worldwide. Mr. Machuel joined the Sodexo Group Executive Committee in 2014 and from 2015 until 2018 served as group chief digital officer and from 2017 until 2018, served as deputy chief executive officer of Sodexo. Additionally, between 2016 and 2017, Mr. Machuel served as chief executive officer of personal and home services at Sodexo.

Mr. Machuel has also served as a member of the G7 Business for Inclusive Growth coalition and the Consumer Goods Forum.
Defendant Schreuder

12

**Defendant Merchant**

36.    Defendant Merchant has served as a Company director since 2021. He also serves

as a member of the Audit Committee and is classified as a Financial Expert.

37.    The 2025 Proxy Statement states the following about Defendant Merchant:

Mr. Merchant served as a senior executive vice president and member of the
executive committee at TIAA from 2015 until his retirement in 2022. While at
TIAA, Mr. Merchant led a variety of organizations including chief information
officer, client services and digital transformation. Prior to serving this role, Mr.
Merchant served as citywide chief information and innovation officer for the City
of New York from 2012 until 2014. From 2006 until 2009, Mr. Merchant served as
executive vice president, chief information and operations officer and member of
the executive committee at Fannie Mae and senior vice president, chief information
officer and chief technology officer at Merrill Lynch, Pierce, Fenner & Smith
Incorporated from 2000 until 2006. Mr. Merchant has served as the chair of the
Audit Committee of a public company and currently serves as a director for Juniper
Networks, Inc.

**Defendant Schreuder**

38.    Defendant Schreuder has served as a Company director since 2021. She also is

Chair of the Compensation and Human Capital Committee.

39.    The 2025 Proxy Statement states the following about Defendant Schreuder:

***Ms. Schreuder*** served as executive vice president and chief operating officer of
Northern Trust Corporation from 2014 until she retired from that role in 2018. Ms.
Schreuder joined Northern Trust in 1980 and during her tenure held multiple roles
as a member of the management team, including service as chief risk officer from
2005 to 2006, president of operations and technology from 2006 to 2011 and
president of wealth management from 2011 to 2014.

Ms. Schreuder is a member of Women Corporate Directors. Ms. Schreuder
currently sits on the board of The Bank of N.T. Butterfield & Son Limited.
Additionally, during the past five years, she served as a director of Avantax, Inc.

**Defendant Ungerleider**

40.    Defendant Ungerleider has served as a Company director since 2021. He also serves

as a member of the Compensation and Human Capital Committee.

41.    The 2025 Proxy Statement states the following about Defendant Ungerleider:

*Mr. Ungerleider* served as a public company chief financial officer for a decade, beginning with The Dow Chemical Company from 2014 to 2015. He then became the chief financial officer of DowDuPont effective upon the merger of The Dow Chemical Company and E.I. du Pont de Nemours and Company, a role he held until 2019 when Dow Inc. separated from DowDuPont. Mr. Ungerleider then served as chief financial officer of Dow Inc. through 2023. He also served as president of Dow Inc. from 2019 through 2023, before retiring from the company in January 2024.

In January 2024, Mr. Ungerleider was appointed as an Operating Advisor to Clayton, Dubilier & Rice funds.

Mr. Ungerleider previously served as chairman of the Dow Company Foundation. He currently serves on the Board of Directors of American Airlines Group Inc. He also serves on the Board of Directors of the Rollin M. Gerstacker Foundation and the Michigan Baseball Foundation. Mr. Ungerleider is the immediate past Chair of the Business Leaders for Michigan business roundtable.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

42.    By reason of their positions as officers, directors, and/or fiduciaries of Kyndryl and because of their ability to control the business and corporate affairs of Kyndryl, the Individual Defendants owed Kyndryl and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Kyndryl in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Kyndryl and its shareholders so as to benefit all shareholders equally.

43.    Each director and officer of the Company owes to Kyndryl and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

14

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Kyndryl, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

45.     To discharge their duties, the officers and directors of Kyndryl were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Kyndryl, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Kyndryl's Board at all relevant times.

47.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

15

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

48. To discharge their duties, the officers and directors of Kyndryl were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Kyndryl were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Kyndryl's own Code of Conduct (the "Code of Conduct").

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Kyndryl conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Kyndryl and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

16

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Kyndryl's operations would comply with all applicable laws and Kyndryl's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

49.    Each of the Individual Defendants further owed to Kyndryl and the shareholders the duty of loyalty requiring that each favor Kyndryl's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

50.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Kyndryl and were at all times acting within the course and scope of such agency.

51.    Because of their advisory, executive, managerial, directorial, and controlling positions with Kyndryl, each of the Individual Defendants had access to adverse, non-public information about the Company.

52.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Kyndryl.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

53.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

54.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (2) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (3) artificially inflate the Company's stock price.

55.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Kyndryl was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

18

56.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

57.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Kyndryl and was at all times acting within the course and scope of such agency.

**KYNDRYL'S CODE OF CONDUCT**

58.    In the Forward of Kyndryl's Code of Conduct, Defendant Schroeter states that "[d]oing business the right way is essential to our growth objectives" and that "[t]here are no shortcuts when it comes to acting with trust, transparency, and integrity."

59.    In the section titled "We Commit to Integrity and Compliance," and under the heading "1.3 Our Shared Responsibilities" the Code of Conduct emphasizes the following duties and standards:

• Act ethically, honestly, and with integrity in everything we do on behalf of Kyndryl.

• Understand and comply with the Code, Kyndryl Policies, and all laws and regulations applicable to our business and specific to your role at Kyndryl.

• Promptly complete all required compliance training when requested.

• Seek help and guidance before taking action when we are unsure of the right thing to do.

• Promptly speak up if something doesn't feel right or we suspect a potential violation of the Code, Kyndryl Policies, or the law.

60.    In the same section, under the subheading "1.4 Leading People," the Code of

Conduct states the following:

Our people managers and leaders at Kyndryl are also expected to lead by example in the following ways:

- Ensure direct reports understand their responsibilities under the Code, Kyndryl Policies, and the law applicable to our business

- Foster and promote a culture where employees feel safe seeking help and reporting concerns

- Listen and respond to questions and concerns from employees promptly; when in doubt, seek help from HR, Legal, or Trust & Compliance

- Never tolerate or allow retaliation against anyone for reporting a concern or cooperating with an investigation

61.    In the same section, under the subheading "1.6 Speaking Up—Where and How to

Report Concerns," the Code of Conduct states the following:

Kyndryls act with trust, transparency, and integrity at all times, and our shared success and reputation depends upon it. We are all in this together and each of us has an ongoing responsibility to help protect the organization from harm and reputational damage. Speaking up when something doesn't feel right or when we suspect potential wrongdoing is not only required and expected under the Code, but is always the right thing to do.

62.    Moreover, in the section titled "We are Honest, Accurate, and Complete," and

under the subheading "3.1 Be Honest," the Code of Conduct states:

The rules are simple: never make misleading or dishonest statements to anyone, and never engage in activities that could be considered unethical, fraudulent, or otherwise unlawful.

63.    The Code of Conduct further expands on this under the subsequent subheading "3.2

Reporting and Recording Information" stating the following:

Kyndryls regularly provide, to Kyndryl and others, information and data, such as requests for reimbursement of business expenses, hours worked  on customer projects, or certifications.

We rely on Kyndryls to record and report honest, accurate, and complete information. Under various laws, Kyndryl is required to maintain accurate books and records. Misrepresentation can lead to civil and criminal penalties for both you and Kyndryl, and the loss of business privileges, such as the right to bid on business, export or import products, or even remain in business.

Record and report only accurate, complete, and honest information. Never report information in a way that is intended to mislead or misinform those who receive it. If you are unsure about the accuracy or completeness of any information, don't guess. Ask your manager for help. If someone directs to provide false or misleading information, report it through the **Reporting Concerns portal or hotline.**

(Emphasis in the original).

64.    In the same section, under the subheading "3.3 Understanding Financial Controls and Reporting," the Code of Conduct states the following:

As a public company, Kyndryl must follow strict accounting principles and standards, report financial information accurately and completely, and have appropriate internal controls and processes to ensure that our accounting and financial reporting complies with law. In other words, we must provide full, fair, accurate, timely, and understandable disclosure in reports that Kyndryl files with, or submits to, the Securities and Exchange Commission and in other public communications made by Kyndryl. Violating accounting and financial reporting laws can result in significant fines, penalties, and imprisonment.

The rules for accounting and financial reporting require the proper recording of, and accounting for, revenues, costs, expenses, assets, liabilities, and cash flows. If you have responsibility or involvement in these areas, you must understand and follow these rules. These rules also prohibit you from assisting others to record or report any information inaccurately or make false or misleading financial reports. Never provide advice to others, including customers, alliance partners, prime contractors, or suppliers, about how they should record or report their own revenues, costs, expenses, assets, and liabilities.

65.    Furthermore, in a section titled "We Compete, Win Business, and Treat Others Ethically," under the subheading "Competing Ethically," the Code of Conduct states the following:

Kyndryl sells its solutions and services on their merits. You should compete vigorously for business, but always ethically and in compliance with our policies and the law, no matter how competitive the environment.

Never make false or misleading statements about Kyndryl and its solutions and services or other companies, including competitors and their products and services.

21

Always be accurate, complete, and honest. Be sure all comparisons to competitors are substantiated. In certain countries, comparative advertising is prohibited or limited.

66.    In a section titled "Code Administration, Notices, and Additional Resources," under the subheading "7.2 Applicability" the Code of Conduct notes that it applies to all directors, officers, and employees. In particular, it states the following:

The policies outlined in the Code of Conduct are designed to ensure that all Kyndryls—directors, officers, and employees—conduct themselves lawfully at all times and maintain the highest ethical standards in every aspect of their business dealings and seek to avoid even the appearance of improper behavior.

67.    In the same suction, under the subheading "7.3 Director and Executive Waivers and Notifications," the Code of Conduct states the following:

Waivers of strict adherence to the Code by Kyndryl officers who are subject to Section 16 of the Securities Exchange Act of 1934, as amended (Executive Officers), and Kyndryl directors may be granted only by the Board of Directors of Kyndryl Holdings, Inc. (the Board of Directors), or a committee thereof, and must be promptly disclosed to Kyndryl Stockholders.

For directors and Executive Officers, any notification or disclosure required to be made to a manager under Sections 2.2 Giving and Receiving Business Amenities and Gifts and 5.2 Avoiding Conflicts of Interest should be made to Kyndryl Legal or the Board of Directors.

68.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to engage or cause the Company to engage in the Cash Flow Metrics Misconduct and to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and

regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## KYNDRYL'S AUDIT COMMITTEE CHARTER

69.     The Company also maintains an Audit Committee Charter. Under the section titled "Purpose," the Audit Committee Charter states the following, in relevant part:

The Audit Committee will assist Board oversight of the integrity of the Company's financial statements, compliance with legal and regulatory requirements, cybersecurity and data privacy matters, the independent accountant's qualifications and independence, and the performance of the internal audit function and independent accountant who are ultimately responsible to the Audit Committee and the Board of Directors.  The Audit Committee will report to the shareholders in the Company's annual proxy statement.  The Audit Committee should keep an open line of communication between the Audit Committee, the independent accountant, the internal auditor, the chief compliance officer, and financial management.

70.     Under a section titled "Responsibilities," in a subsection titled "Financial Reporting," the Audit Committee Charter states that the Audit Committee will:

1.     Discuss with senior financial management and with the independent accountant, significant assumptions, estimates, and judgments used in the preparation of the consolidated financial statements.

2.     Meet to review and discuss with management and the independent accountant the Company's quarterly financial statements to be included in the Company's Quarterly Reports on Form 10-Q, including the specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), prior to their filing with the SEC.  Review the audited financial statements to be included in the Company's Annual Reports on Form 10-K, including the MD&A, prior to their filing with the SEC.  Recommend to the Board of Directors that the audited financial statements be included in the Company's Annual Reports on Form 10-K.  As part of this review, discuss with senior financial management and the independent accountant the accounting principles as applied.  Periodically, discuss with management their approach to earnings press releases and the type of financial information and earnings guidance provided to analysts and rating agencies.  Review earnings press releases and financial results in advance of release as deemed appropriate by the Committee.

3.     Review any significant changes in accounting principles or developments in accounting practices and the effects of these changes upon the Company's financial reporting.

71.     In the same section, under the subheading titled "Independent Accountant," the Audit Committee Charter states, in relevant part, that the Audit Committee will:

7.     Review with the independent accountant any audit problems or difficulties and management's response.

8.     Conduct regular private review sessions with the independent accountant as deemed appropriate by the Committee. Assess the effectiveness of the independent accountant audit.  Review the scope of the independent accountant's proposed audit for the current year and review the annual audit report which is subsequently produced.

72.     In the same section, under the subheading, "Internal Audit Function and Process, the Audit Committee Charter states that the Audit Committee will:

9.     Assess the effectiveness of the internal audit effort through regular meetings conducted separately with the independent accountant and internal auditor.  Review the performance of the Company's General Auditor.

10.    Conduct regular private review sessions with the General Auditor as deemed appropriate by the Committee. 10. Review the scope of the internal audit plan for the current year and review the summary of the results.

11.    Review with the internal auditor the adequacy of the system of internal controls and the responsiveness of management in correcting audit related deficiencies.  Discuss policies regarding risk assessment and risk management.

73.     In the same section, under the subheading "Compliance Function," the Audit Committee Charter states that the Audit Committee will:

12.    Oversee the compliance function and the Company's compliance with legal and regulatory requirements and corporate policy.

13.    Review the implementation of the Kyndryl Code of Conduct process to monitor compliance with the Code through education and employee certification.

74.     In the same section, under the subheading "Internal Controls," the Audit Committee Charter states that the Audit Committee will:

17.    Set, and ensure compliance with, Kyndryl's policies on hiring current and former employees of the independent accountant into significant Company positions.

24

18.     Oversee the adequacy of internal controls and procedures related to officers' expense accounts.

19.     Periodically review the Company's enterprise risk management framework, including the Company's enterprise risk management processes.

75.     In violation of the Audit Committee Charter, Defendants Caruso (as chair), Machuel, and Merchant violated the Audit Committee Charter by engaging in or permitting the Company to engage in the Cash Flow Metrics Misconduct and in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing the oversight of risks related to financial reporting, internal controls, and internal information systems, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

*Relevant Background*

76.     Kyndryl is a Delaware Corporation with its principal executive offices located in New York, New York. The Company is chiefly engaged in the IT industry.

77.     The Company's operations center around designing, building, and managing multi-cloud environments to serve their customers' needs. In particular, the Company provides services

25

including cloud services, data and artificial intelligence services, and digital workplace services, among others.

78.    In 2021, the company's former parent company, IBM effected a separation of its infrastructure services unit of its Global Technology Services segment through the distribution of shares of the Company' common stock to the parent company's stockholders. Moreover, on November 4, 2021, Kyndryl's common stock began trading as an independent company, and IBM disposed of its retained interest in the Company's common stock.

79.    The Company identifies free cash flow as a helpful indicator in the evaluation of the Company's operational performance, frequently highlighting the free cash flow metric to investors. Given the importance of free cash flow to the Company, in its 2025 Proxy Statement, the Company's Compensation and Human Capital Committee announced it had "determined to link the vesting of the PSUs to the achievement of the Company's business objectives and the creation of stockholder value by basing the vesting of the PSUs on the Company's adjusted operating cash flow, total signings and TSR[.]"

### False and Misleading Statements

***August 1, 2024 Earnings Call***

80.    On August 1, 2024, after the market closed, the Company held an earnings call for the fiscal quarter ended on June 30, 2024 ("Q1 2025 Earnings Call") and announced its updated guidance for the 2025 Fiscal Year.

81.    During the Q1 2025 Earnings Call, Defendant Schroeter emphasized that, "in the first quarter, pretax earnings were up significantly year-over-year, and we remain on track to deliver significant cash flow this year."

82.    Regarding the updated guidance, Defendant Schroeter stated the following:

[A]djusted pretax income of at least $460 million reflecting a year-over-year increase of at least $295 million. As David will explain in more detail, the margins at which we're signing contracts and *the other actions we're taking to grow our profitability have us on a path to deliver high single-digit adjusted pretax margins by fiscal 2027* and *yes, the math associated with that is ultimately a $1 billion or more of adjusted pretax income with strong conversion of our earnings into cash flow*.

83.    Moreover, during the Q1 2025 Earnings Call, Defendant Wyshner discussed the Company's balance sheet specifically highlighting the Company's continued strong financial position. Specifically, he stated the following:

As expected, our first quarter was a seasonal user of cash due to annual software and incentive payments and our adjusted free cash flow was negative $116 million in the quarter. Our gross capital expenditures were $122 million, and we received $24 million of proceeds from asset dispositions. We've provided a bridge from our adjusted pretax income to our free cash flow as well as a bridge from our adjusted EBITDA to our free cash flow in the appendix.

*Importantly, our use of cash in the first quarter doesn't change our expectation of generating roughly $300 million of positive adjusted free cash flow this year. Our financial position remains strong*. Our cash balance at June 30 was $1.3 billion. Our cash, combined with available debt capacity under committed borrowing facilities gave us nearly $4.5 billion of liquidity at quarter end. Our debt maturities are well laddered from late 2026 to 2041. We had no borrowings outstanding under our revolving credit facility and our net debt at quarter end was $2 billion.

84.    Defendant Wyshner also emphasized that "[o]ver the medium term, we remain committed to delivering significant margin expansion in generating free cash flow growth[.]" He then further assured the investing public that "[w]e have a solid game plan to drive our strategic progress[,] and this game plan starts with the steps we've already taken to expand our technology alliances, manage our costs and earn a return on all of our revenues."

***August 7, 2024 Form 10-Q***

85.    On August 7, 2024, the Company filed a Form 10-Q with the SEC for the period ended on June 30, 2024 ("Q1 2025 10-Q"). The Q1 2025 10-Q was signed by Defendant Khurana and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act

and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Schroeter and Wyshner attesting to the accuracy of the Q1 2025 10-Q and that "the information included in this [Q1 2025 10-Q] fairly present in all material respects the financial condition, results of operation and cash flows of the [Company]."

86.    The Q1 2025 10-Q, stated the following regarding the Company's internal controls and procedures and notably minimized ongoing issues with internal controls over financial reporting by only identifying issues in information technology general controls. In particular, the Q1 2025 10-Q states the following:

> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded *that the Company's disclosure controls and procedures were not effective as of the end of the period covered by this report due to a material weakness in internal control over financial reporting in the area of our information technology general controls ("ITGCs") that was disclosed in Part II, Item 9A of the Company's Form 10-K.* The deficiencies in ITGCs were related to access and program development and change management controls associated with the Company's large-scale migration in a compressed timeframe of its internal operating systems to a new enterprise resource planning system, which was required to replace the systems temporarily being made available to the Company by our former Parent following our Spin-off. These control deficiencies did not result in a misstatement to the annual or interim consolidated financial statements previously filed or included in this Form 10-Q.
>
> *There have been no changes in the Company's internal control over financial reporting* (as such term is defined in Rule 13a-15(f) of the Exchange Act) *that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the ongoing remediation of the ITGC deficiencies described below.*

87.    The Q1 2025 10-Q also included the following consolidated statement of cash flows, in relevant part:

28

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
(Dollars in millions)
(Unaudited)

| | Three Months Ended June 30, | |
| --- | --- | --- |
| | 2024 | 2023 |
| Cash flows from operating activities: | | |
| Net income (loss) | $ 11 | $ (141) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 127 | 210 |
| Depreciation of right-of-use assets | 70 | 91 |
| Amortization of transition costs and prepaid software | 310 | 325 |
| Amortization of capitalized contract costs | 107 | 138 |
| Amortization of acquisition-related intangible assets | 7 | 8 |
| Stock-based compensation | 24 | 22 |
| Deferred taxes | 17 | 26 |
| Net (gain) loss on asset sales and other | 27 | 29 |
| Change in operating assets and liabilities: | | |
| Deferred costs (excluding amortization) | (363) | (418) |
| Right-of-use assets and liabilities (excluding depreciation) | (65) | (103) |
| Workforce rebalancing liabilities | 7 | (23) |
| Receivables | 163 | 53 |
| Accounts payable | (122) | (143) |
| Taxes | (9) | (25) |
| Other assets and other liabilities | (358) | (222) |
| Net cash provided by (used in) operating activities | $ (48) | $ (173) |
| Cash flows from investing activities: | | |
| Capital expenditures | $ (122) | $ (100) |
| Proceeds from disposition of property and equipment | 24 | 6 |
| Acquisitions and divestitures, net of cash acquired | (46) | — |
| Other investing activities, net | (22) | (19) |
| Net cash used in investing activities | $ (166) | $ (113) |
| Cash flows from financing activities: | | |
| Debt repayments | $ (38) | $ (30) |
| Common stock repurchases for tax withholdings | (7) | (7) |
| Other financing activities, net | (6) | (1) |
| Net cash provided by (used in) financing activities | $ (51) | $ (38) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ (17) | $ (15) |
| Net change in cash, cash equivalents and restricted cash | $ (281) | $ (339) |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,554 | $ 1,860 |
| Cash, cash equivalents and restricted cash at end of period | $ 1,273 | $ 1,521 |
| Supplemental data | | |
| Income taxes paid, net of refunds received | $ 54 | $ 65 |
| Interest paid on debt | $ 40 | $ 46 |

The accompanying notes are an integral part of the financial statements.

***November 7, 2024 Form 10-Q and Earnings Call***

88.    On November 7, 2024, the Company held an earnings call to discuss its financial results for the period ended on September 30, 2024 ("Q2 2025 Earnings Call").

89.    During the Q2 2025 Earnings Call, Defendant Schroeter again highlighted that "adjusted pretax earnings were up substantially year-over-year and we remain on track to deliver significant cash flow this year." Defendant Schroeter further commented on the Company's ability to convert earnings into cash flow. He stated, in relevant part:

> [T]he margins at which we're signing contracts and ***the other actions we're taking to grow our profitability***, keep us well on track to deliver high single-digit adjusted pretax margins by fiscal 2027. ***And yes, the math associated with that is ultimately a $1 billion or more of adjusted pretax income with strong conversion of our earnings into cash flow.*** Our confidence stems from Kyndryl's unique set of attributes that position us well for sustainable growth.

29

90.     During his own comments on the Q2 2025 Earnings Call, Defendant Wyshner touted that "[o]ur financial position remains strong." Defendant Wysnher further added that "[o]ver the medium term, we remain committed to delivering significant margin expansion and generating free cash flow growth[,]" assuring investors that the Company had "a solid game plan to drive our strategic progress, and this, [starting] with the steps we've already taken to expand our technology alliances, manage our costs and earn a return on all of our revenues."

91.     The same day, the Company filed a Form 10-Q with the SEC for the period ended on September 30, 2024 ("Q2 2025 10-Q"). The Q2 2025 10-Q was signed by Defendant Khurana and attached SOX certifications signed by Defendants Schroeter and Wyshner attesting to the accuracy of the Q2 2025 10-Q and that "the information included in this [Q2 2025 10-Q] fairly present in all material respects the financial condition, results of operation and cash flows of the [Company]."

92.     The Q2 2025 10-Q again minimized the ongoing issues with internal controls over financial reporting by only identifying issues in information technology general controls. In particular, the Q2 2025 10-Q stated the following:

> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded ***that the Company's disclosure controls and procedures were not effective as of the end of the period covered by this report due to a material weakness in internal control over financial reporting in the area of our information technology general controls ("ITGCs") that was disclosed in Part II, Item 9A of the Company's Form 10-K.*** The deficiencies in ITGCs were related to access and program development and change management controls associated with the Company's large-scale migration in a compressed timeframe of its internal operating systems to a new enterprise resource planning system, which was required to replace the systems temporarily being made available to the Company by our former Parent following our Spin-off. These

control deficiencies did not result in a misstatement to the annual or interim consolidated financial statements previously filed or included in this Form 10-Q.

***There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the quarter ended September 30, 2024 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the ongoing remediation of the ITGC deficiencies described below.***

93.    The Q2 2025 10-Q also includes the following consolidated statement of cash flows:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
(Dollars in millions)
(Unaudited)

| | Six Months Ended September 30, | |
| --- | --- | --- |
| | 2024 | 2023 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (32) | $ (283) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 276 | 431 |
| Depreciation of right-of-use assets | 154 | 173 |
| Amortization of transition costs and prepaid software | 647 | 631 |
| Amortization of capitalized contract costs | 205 | 281 |
| Amortization of acquisition-related intangible assets | 17 | 15 |
| Stock-based compensation | 49 | 48 |
| Deferred taxes | 17 | 51 |
| Net (gain) loss on asset sales and other | (14) | 22 |
| Change in operating assets and liabilities: | | |
| Deferred costs (excluding amortization) | (852) | (699) |
| Right-of-use assets and liabilities (excluding depreciation) | (145) | (195) |
| Workforce rebalancing liabilities | (13) | (18) |
| Receivables | 193 | (110) |
| Accounts payable | (237) | (494) |
| Taxes | (31) | (55) |
| Other assets and other liabilities | (133) | 75 |
| **Net cash provided by (used in) operating activities** | $ 101 | $ (127) |
| | | |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (256) | $ (275) |
| Proceeds from disposition of property and equipment | 54 | 119 |
| Acquisitions and divestitures, net of cash acquired | (46) | — |
| Other investing activities, net | 7 | (53) |
| **Net cash used in investing activities** | $ (241) | $ (208) |
| | | |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (73) | $ (67) |
| Common stock repurchases for tax withholdings | (24) | (12) |
| Other financing activities, net | (5) | (1) |
| **Net cash provided by (used in) financing activities** | $ (101) | $ (80) |
| | | |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ 17 | $ (33) |
| Net change in cash, cash equivalents and restricted cash | $ (224) | $ (448) |
| | | |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,554 | $ 1,860 |
| Cash, cash equivalents and restricted cash at end of period | $ 1,330 | $ 1,412 |
| | | |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 89 | $ 88 |
| Interest paid on debt | $ 60 | $ 59 |

The accompanying notes are an integral part of the financial statements.

31

94.     Furthermore, Defendants Schroeter and Wyshner signed the SOX certifications, included in the Q2 2025 10-Q, attesting to the accuracy of financial reporting, the disclosure of any material changes to internal controls over financial reporting, and the disclosure of fraud.

95.     Additionally, Defendant Khurana signed the Q2 2025 10-Q, as Kyndryl's authorized signatory pursuant to the Securities Exchange Act.

### February 3, 2025 Press Release

96.     On February 3, 2025, the Company issued a press release announcing its financial results for the period ended on December 31, 2024 ("Q3 2025 Press Release"). In the Q3 2025 Press Release, Defendant Wyshner was quoted as highlighting the Company's progress and touting the Company's financial prospects. In particular, Defendant Wyshner is quoted as stating:

> Once again, we delivered strong progress on our three-A's initiatives and robust signings growth that demonstrate customer demand for the essential services and insights we offer.  The margins associated with our signings continue to support our outlook for future earnings and free cash flow growth[.]

### February 4, 2025 Earnings Call

97.     The following day, February 4, 2025, the Company held an earnings call to discuss its financial results for the period ended on December 31, 2024 ("Q3 2025 Earnings Call").

98.     During the Q3 2025 Earnings Call, Defendant Schroeter touted that the Company had "generated more than $170 million of adjusted free cash flow in the quarter[,]" and was "led by double-digit revenue growth in Kyndryl Consult and demand for modernization, cloud, security and AI Services."

99.     During the Q3 2025 Earnings Call, Defendant Schroeter further stated that:

> As we've highlighted before, our evolving business mix, where we're focusing on higher value services for our customers is driving increased profitability and fueling future top line growth. We have confidence in our ability to continue to set ambitious goals and achieve them. And with that in mind, in November, we introduced our medium-term outlook with a triple double single mnemonic. **_We're_**

*projecting to triple our adjusted free cash flow in fiscal 2028 compared to fiscal 2025 to roughly $1 billion.* We're projected to more than double our adjusted pretax income to at least $1.2 billion over that same time period, and *we project that we only need revenue to reach mid-single-digit annual growth in fiscal 2028 and beyond to deliver those goals.*

*With strong conversion of our earnings to free cash flow, we'll balance our approach to capital allocation by investing in organic growth opportunities and occasional tuck-in acquisitions, and at the same time, return capital to shareholders through our share repurchase program.* Because of our recognized industry leadership, expertise, scale and financial strength, customers trust us to manage their most missioncritical systems. And in the last 3 years, we've become an integral part of the broad IT ecosystem that is relevant to our customers. The mission-critical infrastructure services we provide are our foundation for sustained profitable growth.

### *February 6, 2025 Form 10-Q*

100.    On February 6, 2025, the Company filed a Form 10-Q with the SEC for the period ended on December 31, 2024 ("Q3 2025 10-Q"). The Q3 2025 10-Q was signed by Defendant Khurana and attached SOX certifications signed by Defendants Schroeter and Wyshner attesting to the accuracy of the Q3 2025 10-Q and that "the information included in this [Q3 2025 10-Q] fairly present in all material respects the financial condition, results of operation and cash flows of the [Company]."

101.    The Q3 2025 10-Q includes the following regarding the Company's disclosure controls and procedures:

The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that *the Company's disclosure controls and procedures were not effective as of the end of the period covered by this report due to a material weakness in internal control over financial reporting in the area of our information technology general controls ("ITGCs") that was disclosed in Part II, Item 9A of the Company's Form 10-K.* The deficiencies in ITGCs were related to access and program development and change management controls associated with the Company's large-scale migration in a compressed

timeframe of its internal operating systems to a new enterprise resource planning system, which was required to replace the systems temporarily being made available to the Company by our former Parent following our Spin-off. These control deficiencies did not result in a misstatement to the annual or interim consolidated financial statements previously filed or included in this Form 10-Q.

***There have been no changes in the Company's internal control over financial reporting*** (as such term is defined in Rule 13a-15(f) of the Exchange Act) ***that occurred during the quarter ended December 31, 2024 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the ongoing remediation of the ITGC deficiencies described below.***

102.    Additionally, the Q3 2025 10-Q included the following consolidated statement of cash flows:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
(Dollars in millions)
(Unaudited)

| | Nine Months Ended December 31, | |
| --- | --- | --- |
| | 2024 | 2023 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ 183 | $ (295) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 471 | 639 |
| Depreciation of right-of-use assets | 220 | 251 |
| Amortization of transition costs and prepaid software | 974 | 946 |
| Amortization of capitalized contract costs | 314 | 418 |
| Amortization of acquisition-related intangible assets | 23 | 23 |
| Stock-based compensation | 78 | 72 |
| Deferred taxes | 22 | 55 |
| Net (gain) loss on asset sales and other | (108) | (6) |
| Change in operating assets and liabilities: | | |
| Deferred costs (excluding amortization) | (1,273) | (1,023) |
| Right-of-use assets and liabilities (excluding depreciation) | (212) | (269) |
| Workforce rebalancing liabilities | (22) | (28) |
| Receivables | 177 | (13) |
| Accounts payable | (265) | (339) |
| Taxes | (39) | (33) |
| Other assets and other liabilities | (183) | (90) |
| **Net cash provided by operating activities** | $ 361 | $ 309 |
| | | |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (365) | $ (449) |
| Proceeds from disposition of property and equipment | 70 | 134 |
| Acquisitions and divestitures, net of cash acquired | 137 | — |
| Other investing activities, net | (42) | (35) |
| **Net cash used in investing activities** | $ (199) | $ (350) |
| | | |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (108) | $ (103) |
| Common stock repurchases | (30) | — |
| Common stock repurchases for tax withholdings | (32) | (19) |
| Other financing activities, net | (2) | (1) |
| **Net cash used in financing activities** | $ (172) | $ (123) |
| | | |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ (39) | $ (5) |
| Net change in cash, cash equivalents and restricted cash | $ (49) | $ (169) |
| | | |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,554 | $ 1,860 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,505 | $ 1,691 |
| | | |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 123 | $ 140 |
| Interest paid on debt | $ 100 | $ 108 |

The accompanying notes are an integral part of the financial statements.

***May 7, 2025 Press Release***

34

103.    On May 7, 2025, the Company issued a press release announcing its financial results for the quarter and fiscal year ended on March 31, 2025 ("FY 2025 Press Release"). The FY 2025 Press Release announced the Company's 2026 Fiscal Year outlook for adjusted free cash flow of approximately $550 million.

104.    In the FY 2025 Press Release, Defendant Wyshner is quoted as emphasizing the Company's financial prospects stating, "[w]e delivered strong signings growth in fiscal year 2025, with attractive margins built into those signings . . . demonstrat[ing] the potential our business has to continue to grow our revenue, increase our earnings and generate cash flow."

*May 8, 2025 Earnings Call*

105.    On May 8, 2025, the Company held an earnings call to discuss the financial results of the fourth quarter and full year for the period ended of March 31, 2025 ("FY 2025 Earnings Call").

106.    During the FY 2025 Earnings Call, Defendant Wyshner again highlighted that, "[o]ver the medium term, we remained committed to delivering significant margin expansion and generating free cash flow growth," while at the same time having, "a solid game plan to drive our strategic progress . . . start[ing] with the steps we've already taken to expand our technology alliances, manage our costs and earn a return on all of our revenues."

*May 30, 2025 Form 10-K*

107.    On May 30, 2025, the Company filed a Form 10-K with the SEC for the fiscal year ended on March 31, 2025 ("2025 10-K"). The 2025 10-K was signed by Defendants Schroeter, Wyshner, and Khurana. Defendants Caruso, Harris, Hester, Jackson, Kugel, Machuel, Merchant, Schreuder, Ungerleider also signed the 2025 10-K through an attorney-in-fact. Additionally, the 2025 10-K attached SOX certifications signed by Defendants Schroeter and Wyshner attesting to

the accuracy of the 2025 10-K and that "the information included in this [2025 10-K] fairly present in all material respects the financial condition, results of operation and cash flows of the [Company]."

108.    The 2025 10-K omitted any mention of the ongoing issues with the Company's financial reporting. In particular, the 2025 10-K stated the following:

> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of March 31, 2025, the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer *have concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report.*
>
> * * *
>
> Management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our internal control over financial reporting as of March 31, 2025. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework (2013). *Based on this evaluation, management concluded that, as of March 31, 2025, our internal control over financial reporting was effective.*
>
> * * *
>
> *There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the quarter ended March 31, 2025 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the remediation of our information technology general controls as part of our previously disclosed remediation activities.*

109.    The 2025 10-K included the following consolidated statement of cash flows:

36

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
(Dollars in millions)

| | | Year Ended March 31, | |
| --- | --- | --- | --- |
| | 2025 | 2024 | 2023 |
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ 252 | $ (340) | $ (1,374) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | | |
| Depreciation and amortization: | | | |
| Depreciation of property, equipment and capitalized software | 660 | 834 | 900 |
| Depreciation of right-of-use assets | 327 | 319 | 428 |
| Amortization of transition costs and prepaid software | 1,278 | 1,256 | 1,199 |
| Amortization of capitalized contract costs | 420 | 531 | 472 |
| Amortization of acquisition-related intangible assets | 30 | 30 | 46 |
| Stock-based compensation | 100 | 95 | 113 |
| Deferred taxes | (1) | (13) | 285 |
| Net (gain) loss on asset sales and other | (152) | 43 | 6 |
| Change in operating assets and liabilities: | | | |
| Deferred costs (excluding amortization) | (1,762) | (1,569) | (1,592) |
| Right-of-use assets and liabilities (excluding depreciation) | (314) | (335) | (361) |
| Workforce rebalancing liabilities | (25) | (38) | 41 |
| Receivables | 289 | 11 | 664 |
| Accounts payable | (89) | (305) | 282 |
| Taxes | (1) | (2) | 90 |
| Other assets and other liabilities | (71) | (63) | (415) |
| **Net cash provided by operating activities** | $ 942 | $ 454 | $ 781 |
| **Cash flows from investing activities:** | | | |
| Capital expenditures | $ (605) | $ (651) | $ (865) |
| Proceeds from disposition of property and equipment | 83 | 138 | 23 |
| Acquisitions and divestitures, net of cash acquired | 139 | | |
| Other investing activities, net | (20) | (40) | 7 |
| **Net cash used in investing activities** | $ (404) | $ (553) | $ (835) |
| **Cash flows from financing activities:** | | | |
| Debt repayments | $ (148) | $ (644) | $ (118) |
| Proceeds from issuance of debt, net of debt issuance costs | | 494 | |
| Common stock repurchases | (93) | | |
| Common stock repurchases for tax withholdings | (45) | (22) | (19) |
| Other financing activities, net | | 2 | (4) |
| **Net cash used in financing activities** | $ (286) | $ (170) | $ (141) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ (16) | $ (37) | $ (100) |
| Net change in cash, cash equivalents and restricted cash | $ 235 | $ (306) | $ (294) |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,554 | $ 1,860 | $ 2,154 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,789 | $ 1,554 | $ 1,860 |
| **Supplemental data** | | | |
| Income taxes paid, net of refunds received | $ 149 | $ 191 | $ 167 |
| Interest paid on debt | $ 119 | $ 118 | $ 98 |

The accompanying notes are an integral part of the financial statements.

110. The statements contained in ¶¶80-109, were materially false and misleading, because they failed to disclose: (1) the Company's financial statements and free cash flow metrics were inaccurate; (2) the sustainability of the Company's financial growth was overstated; (3) the Individual Defendants caused the Company to engage in the Cash Flow Metrics Misconduct; (4) as a result, the Company's financial condition and prospects were materially worse than represented; (5) the Company lacked adequate internal controls; and (6) as a result of the foregoing, the Company would be unable to file its Form 10-Q for the period ended on December 31, 2025. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***June 16, 2025 Proxy Statement***

111.   On June 16, 2025, Defendants Schroeter, Caruso, Harris, Hester, Jackson, Kugel, Machuel, Merchant, Schreuder, and Ungerleider solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

112.   The 2025 Proxy Statement called for the Company's shareholders to vote *inter alia,* to: (1) elect Defendants Kugel, Machuel, and Merchant, to the Board for a one-year term; (2) approve, on an advisory basis, the compensation of the Company's named executives; and (3) the ratification of PricewaterhouseCoopers LLP ("PwC") as the Company's independent registered public accounting firm for the 2026 Fiscal Year.

113.   Regarding the "Board and Committee Oversight of Risk Management," the 2025 Proxy Statements states:

> The **Board** is responsible for the overall oversight of our enterprise risk management program and receives regular updates from management on our material operational, strategic and financial risks (over the short-, intermediate- and long-term) and plans to monitor, manage and mitigate these risks. With respect to operational and strategic risks, the Board receives periodic updates from: our Chief Information Security Officer, Chief Information Officer, Security & Resiliency global practice leader and other senior leaders with respect to cybersecurity and data privacy matters; our Chief Human Resources Officer on compensation and human capital matters; and our Global Head of Corporate Affairs and Senior Vice President, Global Citizenship & Sustainability with respect to environmental and corporate responsibility matters. The Board considers the foregoing matters so critical to our business that it maintains concurrent oversight over them with its committees.

(Emphasis in the original.)

114.   In the same section, the 2025 Proxy Statement further states the Audit Committee's specific oversight responsibilities, stating that:

> The **Audit Committee** periodically reviews our accounting, reporting and financial practices and risk exposures, including with respect to the integrity of our financial statements, our financial reporting, our administrative, financial and disclosure controls, our enterprise risk management program, compliance with legal and regulatory requirements, our engagement with Kyndryl's independent auditor and our cybersecurity and data privacy controls. Through its regular meetings with

management, including the finance, legal, internal audit and information security functions, and Kyndryl's independent registered public accounting firm, the Audit Committee reviews and discusses all significant areas of our business and related risks and summarizes for the Board areas of risk, including cyber risk, and any mitigating factors. With respect to compliance matters, the Audit Committee receives regular updates from our Chief Compliance Officer, who reports to our General Counsel. With respect to enterprise risk management, the Audit Committee receives regular updates from our Senior Vice President & General Auditor. With respect to cybersecurity-related matters, the Audit Committee receives periodic updates from our Chief Information Security Officer about the Company's cybersecurity policies and practices, cybersecurity developments, trends, risks, notable incidents, mitigation strategies, maturity initiatives and other developments, as well as periodic updates from our Chief Information Officer, Security & Resiliency global practice leader and other senior leaders.

(Emphasis in the original.)

115.    Regarding the "Kyndryl Code of Conduct" the 2025 Proxy Statement provided:

Our code of ethics is The Kyndryl Code of Conduct. The Kyndryl Code of Conduct is applicable to all our directors, officers and employees, including our Chairman and Chief Executive Officer, Chief Financial Officer, Controller and other senior financial officers. The Kyndryl Code of Conduct sets forth our policies and expectations on a number of topics, including conflicts of interest, compliance with laws (including insider trading laws), use of our assets and business conduct and fair dealing. The Kyndryl Code of Conduct also satisfies the requirements for a code of ethics, as defined by Item 406 of Regulation S-K promulgated by the SEC. The Kyndryl Code of Conduct can be found on our Investor Relations website at investors.kyndryl.com under Corporate Responsibility: Governance: Governance Documents: The Kyndryl Code of Conduct.

To the extent applicable, we will disclose within four business days any substantive changes in, or waivers of, The Kyndryl Code of Conduct granted to our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions, by posting such information on our website as set forth above rather than by filing a Current Report on Form 8-K. In the case of a waiver for an executive officer or a director, the required disclosure also will be made available on our website within four business days of the date of such waiver.

116.    Defendants Schroeter, Caruso, Harris, Hester, Jackson, Kugel, Machuel, Merchant, Schreuder, and Ungerleider caused the 2025 Proxy Statement to be false and misleading by failing to disclose *inter alia,* that: (1) the Company's financial statements and free cash flow metrics were

39

inaccurate; (2) the sustainability of the Company's financial growth was overstated; (3) the Individual Defendants caused the Company to engage in the Cash Flow Metrics Misconduct; (4) as a result, the Company's financial condition and prospects were materially worse than represented; (5) the Company lacked adequate internal controls; and (6) as a result of the foregoing, the Company would be unable to file its Form 10-Q for the period ended on December 31, 2025.

117. The 2025 Proxy Statement also failed to disclose, inter alia, that: (1) although the Company claimed its officers and directs adhered to its Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

118. As a result of Defendants Schroeter, Caruso, Harris, Hester, Jackson, Kugel, Machuel, Merchant, Schreuder, and Ungerleider causing the 2025 Proxy Statement to be false and misleading, the Company's shareholders to voted *inter alia*, to: (1) elect Defendants Kugel, Machuel, and Merchant, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of the Company's named executives; and (3) the ratification of the PwC as the Company's independent registered public accounting firm for the fiscal year ending March 31, 2026.

### The Truth Begins to Emerge as False and Misleading Statements Continue

*August 4, 2025 Press Release*

40

119. The truth began to emerge on August 4, 2025, after the market closed, when the Company issued a press release announcing its financial results for the period ended on June 30, 2025 ("Q1 2026 Press Release").

120. The Q1 2026 Press Release reported revenue and free cash flow use that missed analysts' estimates. Analysts had estimated $3.788 billion in revenue and $219 million in free cash flow use, whereas the Q1 2026 Press Release reported revenue of $3.743 billion and free cash flow use of $222 million.

121. Despite this, the Q1 2026 Press Release assured investors that the additional use of free chase flow was a result of "typical seasonal outflows."

***August 5, 2025 Earnings Call and Form 10-Q***

122. The truth continued to emerge on August 5, 2025, when the Company held an earnings call to discuss its financial results for the period ended on June 30, 2025 ("Q1 2026 Earnings Call").

123. During the Q1 2026 Earnings Call, Defendant Schroeter disclosed that "revenue declined in constant currency as we continue to drive progress on our accounts initiative[.]" He further revealed that, "[i]n fact, all of the Q1 revenue change was attributed to our actions to address 8 focus accounts where we reduced revenue by half and significantly increased our gross margin over the last year." Defendant Schroeter also added that "[w]e also saw some deals we had targeted for Q1 move out of the quarter."

124. On this news, the price of the Company's Common stock fell $7.76 per share, or about 21.1%, from a closing price of $36.70 per share on August 4, 2025, to a closing price of $28.94 per share on August 5, 2025. However, the Individual Defendants continued to obfuscate

the truth about the accuracy of the Company's free cash flow metrics and the Company's involvement in the Cash Flow Metrics Misconduct.

125.   For example, during the Q1 2026 Earnings Call, Defendant Schroeter continued to assure the investing public of the Company's financial positioning. Defendant Schroeter touted that "[w]ith strong conversion of our earnings to free cash flow, we're optimizing our capital allocation by investing in organic growth opportunities, returning capital to shareholders through our share repurchase program and occasionally pursing tuck-in acquisitions."

126.   Defendant Wyshner also continued to minimize risks and in particular minimized the "significant use of cash" and attributed it to "annual software and incentive compensation payments[.]" Defendant Wyshner specifically stated that:

> On the topic of cash flow, for the year as a whole, we're forecasting roughly 100% conversion of adjusted pretax income less cash taxes into free cash flow. With cash taxes of roughly $175 million, this implies free cash flow of approximately $550 million. We also project roughly $700 million of net capital expenditures and about $700 million of depreciation expense. ***From a timing perspective, while Q1 was a significant user of cash due to annual software and incentive compensation payments, subsequent quarters will be more favorable.***

127.   During the question-and-answer portion of the Q1 2026 Earnings Call, an Oppenheim analyst asked about the use of free cash flow for stock buybacks. In response, Defendant Wyshner emphasized the Company's financial strength stating that:

> Just on the buyback question, we repurchased $65 million of stock in the quarter. And since we've launched the program in November, we've repurchased almost 2% of our shares outstanding. As we go into this quarter, we'll look at our cash flow. We'll look at the share price. We'll look at market conditions, we'll look at other factors and make a decision about how much stock to buy back. But we have over $140 million of available capacity under the existing authorization. ***And you're absolutely right, we're moving into the cash flow generating portion of the year for us. So[,] we will have additional cash flow to deploy.***

128.   On the same day, the Company filed a Form 10-Q with the SEC for the period ended June 30, 2025 ("Q1 2026 10-Q"). The Q1 2026 10-Q was signed by Defendant Khurana

and the attached SOX certifications signed by Defendants Schroeter and Wyshner attesting to the accuracy of the Q1 2026 10-Q and that "the information included in this [Q1 2026 10-Q] fairly present in all material respects the financial condition, results of operation and cash flows of the [Company].".

129.    The Q1 2026 10-Q stated the following about the Company's disclosure controls and procedures:

> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report.***
>
> ***There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.***

130.    The Q1 2026 10-Q also included the following consolidated statement of cash flows:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
(Dollars in millions)
(Unaudited)

| | Three Months Ended June 30, | |
| --- | --- | --- |
| | 2025 | 2024 |
| **Cash flows from operating activities:** | | |
| Net income | $ 56 | $ 11 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 191 | 127 |
| Depreciation of right-of-use assets | 73 | 70 |
| Amortization of transition costs and prepaid software | 308 | 310 |
| Amortization of capitalized contract costs | 106 | 107 |
| Amortization of acquisition-related intangible assets | 7 | 7 |
| Stock-based compensation | 24 | 24 |
| Deferred taxes | (10) | 17 |
| Net (gain) loss on asset sales and other | — | 27 |
| Change in operating assets and liabilities: | | |
| Right-of-use assets and liabilities (excluding depreciation) | (88) | (65) |
| Workforce rebalancing liabilities | 3 | 7 |
| Receivables | 46 | 163 |
| Accounts payable | (269) | (122) |
| Taxes | 27 | (9) |
| Deferred costs (excluding amortization) | (1,381) | (363) |
| Other assets and other liabilities | 781 | (358) |
| Net cash provided by (used in) operating activities | $ (124) | $ (48) |
| | | |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (143) | $ (122) |
| Proceeds from disposition of property and equipment | 45 | 24 |
| Acquisitions and divestitures, net of cash acquired | 1 | (46) |
| Other investing activities, net | 22 | (22) |
| Net cash used in investing activities | $ (74) | $ (166) |
| | | |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (36) | $ (38) |
| Common stock repurchases | (62) | — |
| Common stock repurchases for tax withholdings | (67) | (7) |
| Other financing activities, net | (5) | (6) |
| Net cash used in financing activities | $ (170) | $ (51) |
| | | |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ 46 | $ (17) |
| Net change in cash, cash equivalents and restricted cash | $ (323) | $ (281) |
| | | |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,789 | $ 1,554 |
| Cash, cash equivalents and restricted cash at end of period | $ 1,466 | $ 1,273 |
| | | |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 67 | $ 54 |
| Interest paid on debt | $ 39 | $ 40 |

The accompanying notes are an integral part of the financial statements.

**November 5, 2025 Form 10-Q**

131.    On November 5, 2025, the Company filed a Form 10-Q with the SEC for the period ended on September 30, 2025 ("Q2 2026 10-Q"). The Q2 2026 10-Q was signed by Defendant Khurana and attached SOX certifications signed by Defendants Schroeter and Wyshner attesting to the accuracy of the Q2 2026 10-Q and that "the information included in this [Q2 2026 10-Q] fairly present in all material respects the financial condition, results of operation and cash flows of the [Company]."

132.    The Q2 2026 10-Q stated the following about the Company's disclosure controls and procedures:

44

The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report.***

***There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.***

133.    The Q2 2026 10-Q also included the following consolidated statement of cash flows:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
(Dollars in millions)
(Unaudited)

| | Six Months Ended September 30, | |
|---|---|---|
| | 2025 | 2024 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ 124 | $ (32) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 384 | 276 |
| Depreciation of right-of-use assets | 147 | 154 |
| Amortization of transition costs and prepaid software | 613 | 647 |
| Amortization of capitalized contract costs | 231 | 205 |
| Amortization of acquisition-related intangible assets | 14 | 17 |
| Stock-based compensation | 50 | 49 |
| Deferred taxes | (17) | 17 |
| Net (gain) loss on asset sales and other | — | (14) |
| Change in operating assets and liabilities: | | |
| Right-of-use assets and liabilities (excluding depreciation) | (173) | (145) |
| Workforce rebalancing liabilities | (1) | (13) |
| Receivables | 6 | 193 |
| Accounts payable | (328) | (237) |
| Taxes | 23 | (31) |
| Deferred costs (excluding amortization) | (1,697) | (852) |
| Other assets and other liabilities | 645 | (133) |
| **Net cash provided by operating activities** | $ 22 | $ 101 |
| | | |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (272) | $ (256) |
| Proceeds from disposition of property and equipment | 51 | 54 |
| Acquisitions and divestitures, net of cash acquired | 1 | (46) |
| Other investing activities, net | 26 | 7 |
| **Net cash used in investing activities** | $ (196) | $ (241) |
| | | |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (70) | $ (73) |
| Common stock repurchases | (151) | — |
| Common stock repurchases for tax withholdings | (89) | (24) |
| Other financing activities, net | (1) | (5) |
| **Net cash used in financing activities** | $ (310) | $ (101) |
| | | |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ 30 | $ 17 |
| Net change in cash, cash equivalents and restricted cash | $ (453) | $ (224) |
| | | |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,789 | $ 1,554 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,336 | $ 1,330 |
| | | |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 92 | $ 89 |
| Interest paid on debt | $ 58 | $ 60 |

The accompanying notes are an integral part of the financial statements.

134.    The statements contained in ¶¶125-133 above were materially false and misleading, because they failed to disclose: (1) the Company's financial statements and free cash flow metrics were inaccurate; (2) the sustainability of the Company's financial growth was overstated; (3) the Individual Defendants caused the Company to engage in the Cash Flow Metrics Misconduct; (4) as a result, the Company's financial condition and prospects were materially worse than represented; (5) the Company lacked adequate internal controls; and (6) as a result of the foregoing, the Company would be unable to file its Form 10-Q for the period ended on December 31, 2025. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### The Truth Fully Emerges

*February 9, 2026 Notification of Late Filing*

135.    The truth fully emerged on February 9, 2026, when the Company filed a Notification of Late Filing on Form 12b-5 (the "Late Filing Notice") with the SEC which announced it would be unable to file its Form 10-Q for the period ended on December 31, 2025, on time.

136.    The Late Filing Notice further revealed an investigation into the Company's financial reporting conducted by the SEC. In particular, it stated the following:

> The Company, through the Audit Committee of its Board of Directors, *is reviewing its cash management practices, related disclosures (including regarding the drivers of the Company's adjusted free cash flow metric)*, the efficacy of the Company's internal control over financial reporting, and certain other matters following the Company's receipt of voluntary document requests from the Division of Enforcement of the Securities and Exchange Commission ("SEC") relating to such matters. Due to this review, the finalization of the Quarterly Report, including the Company's assessment of internal control over financial reporting, requires additional time to complete.

* * *

46

In connection with the filing of the Quarterly Report, when made, *the Company anticipates reporting material weaknesses in the Company's internal control over financial reporting for the period covered in the Quarterly Report, as well as for the full fiscal year ended March 31, 2025, and the first two fiscal quarters of fiscal year 2026, which are expected to include, but may not be limited to, the effectiveness and strength of certain functions at the Company, including with respect to controls related to information and communication and tone at the top. As a result, the Company notes that its assessment of internal control over financial reporting and the related opinion of PricewaterhouseCoopers LLP only with respect to the effectiveness of the Company's internal control over financial reporting as of March 31, 2025 included in the Company's Annual Report on Form 10-K for the full fiscal year ended March 31, 2025 should no longer be relied upon.*

### February 9, 2026 Departure 8-K

137. On the same day, the Company filed a Form 8-K with the SEC announcing the departures of several executives (the "Departure 8-K"). In the Departure 8-K, the Company announced that Edward Sebold was leaving his position as General Counsel and Corporate Secretary and that Defendant Wyshner would be resigning from his position as CFO of the Company. Moreover, the Departure 8-K also announced that Defendant Khurana had "stepped down from his position as Senior Vice President and Global Controller of the Company and assumed a different role."

### February 9, 2026 Interim Officers 8-K

138. On February 9, 2025, the Company filed another Form 8-K with the SEC (the "Interim Officers 8-K"). The Interim Officers 8-K announced that "Harsh Chugh has been named as Interim Chief Financial Officer, Mark Ringes has been named Interim General Counsel and Bhavana Doegar has been named Interim Corporate Controller effectively immediately."

### February 9, 2026 Earnings Press Release

139. The same day, the Company issued a press release which reported disappointing financial results for the period ended on December 31, 2025 (the "Q3 2026 Press Release"). The

Q3 2026 Press Release reported a revenue of $3.86 billion and an adjusted EPS of $0.52 which failed to meet analysts' estimates of $3.89 billion and $0.61, respectively.

140.    The Q3 2026 Press Release further noted that the company's adjusted EBITDA and adjusted pretax profit also fell below analysts' estimates. In particular, the Q3 2026 Press Release stated that the adjusted EBITDA for the third quarter was $696 million and the adjusted pretax profit was $168 million whereas analysis estimates were at $701.2 million and $192.4 million respectively.

141.    Moreover, the Q3 2026 Press Release announced that the Company had dramatically lowered its full year guidance for the 2026 Fiscal Year to lower free cash flow from $550 million to a range of $325 and $375 million.

142.    On this news, the price of the Company's common stock dropped $12.90 or approximately 54.9%, from a closing price of $23.49 per share on February 6, 2026, to a closing price of $10.59 per share on February 9, 2026.

## SUBSEQUENT DEVELOPMENTS

143.    On February 17, 2026, the Company filed the previously delayed Q3 2026 10-Q with the SEC. the Q3 2026 10-Q revealed, *inter alia*:

Item 4. Controls and Procedures

* * *

Material Weaknesses in Internal Control over Financial Reporting

* * *

The Company identified the following material weaknesses in its internal control over financial reporting:

- The Company's senior finance executives failed to set an appropriate tone at the top based on the principles associated with the control environment component of the COSO framework. ***Specifically, there was a lack of***

*transparency with the Company's Chief Executive Officer, the Audit Committee of the Board of Directors (the "Board") and the Board, such that disclosure processes, including with respect to certain cash management practices regarding deferring vendor payments quarter to quarter, were impacted*. Additionally, the Company lacked an appropriate complement of finance personnel with sufficient understanding of their responsibilities as Disclosure Committee members and with adequate competency in their responsibilities regarding disclosure controls.

- *The Company did not design and maintain effective controls related to the information and communication component of the COSO framework to ensure appropriate communication pertaining to the disclosure process between certain functions within the Company*, including the Company's Disclosure Committee and the Chief Executive Officer, as well as with the Audit Committee and the Board.

- The aforementioned material weaknesses contributed to an additional material weakness. *The Company did not design and maintain effective controls regarding the internal investigation, escalation and documentation of complaints made through the Company's reporting hotline* and certain other available reporting channels, including with respect to appropriate escalation of certain complaints to the Audit Committee.

## REPURCHASES DURING THE RELEVANT PERIOD

144. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $349.1 million to repurchase 11 million shares of its own common stock at artificially inflated prices between November 2024 and December 2025.

145. According to the Q3 2025 10-Q, between November 1, 2024 and November 30, 2024, the Company purchased 86,970 shares of its own common stock at an average price of $34.50 per share, for a total cost to the Company of approximately $3,000,465.

146. As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $2,079,453 for repurchases of its own common stock between November 1, 2024 and November 30, 2024.

147. According to the Q3 2025 10-Q, between December 1, 2024 and December 31, 2024, the Company purchased 772,249 shares of its own common stock at an average price of $34.97 per share, for a total cost to the Company of approximately $27,005,548.

148. As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $8,178,117 for repurchases of its own common stock between December 1, 2024 and December 31, 2024.

149. According to the 2025 10-K, between the period January 1, 2025 and January 31, 2025, the Company purchased 268,362 shares of its own common stock at an average price of $37.91 per share, for a total cost to the Company of approximately $10,173,603.

150. As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $7,331,650 for repurchases of its own stock between January 1, 2025 and January 31, 2025.

151. According to the 2025 10-K, between February 1, 2025 and February 28, 2025, the Company purchased 566,091 shares of its own common stock at an average price of $38.95 per share, for a total cost to the Company of approximately $22,049,244.

152. As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $16,054,341 for repurchases of its own common stock between February 1, 2025 and February 28, 2025.

153.    According to the 2025 10-K, between the period March 1, 2025 and March 31, 2025, the Company purchased 932,676 shares of its own common stock at an average price of $34.54 per share, for a total cost to the Company of approximately $32,214,629.

154.    As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $22,337,590 for repurchases of its own common stock between March 1, 2025 and March 31, 2025.

155.    According to the Q1 2026 10-Q, between the period April 1, 2025 and April 30, 2025, the Company purchased 595,693 shares of its own common stock at an average price of $30.23 per share, for a total cost to the Company of approximately $18,007,799.

156.    As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $11,699,411 for repurchases of its own common stock between April 1, 2025 and April 30, 2025.

157.    According to the Q1 2026 10-Q, between May 1, 2025 and May 31, 2025, the Company purchased 339,241 shares of its own common stock at an average price of $36.97 per share, for a total cost to the Company of approximately $12,541,740.

158.    As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $8,949,178 for repurchases of its own common stock between May 1, 2025 and May 31, 2025.

159.    According to the Q1 2026 10-Q, between the period June 1, 2025 and June 30, 2025, the Company purchased 844,764 shares of its common stock at an average price of $40.78 per share, for a total cost to the Company of approximately $34,449,476.

160.     As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $25,503,425 for repurchases of its own common stock between June 1, 2025 and June 30, 2025.

161.     According to the Q2 2026 10-Q, between the period July 1, 2025 and July 31, 2025, the Company purchased 207,928 shares of its own common stock at an average price of $40.77 per share, for a total cost to the Company of approximately $8,477,225.

162.     As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $6,275,267 for repurchases of its own common stock between July 1, 2025 and July 31, 2025.

163.     According to the Q2 2026 10-Q, between the period August 1, 2025 and August 31, 2025, the Company purchased 1,447,359 shares of its own common stock at an average price of $30.50 per share, for a total cost to the Company of approximately $44,144,450.

164.     As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $28,816,918 for repurchases of its own common stock between August 1, 2025 and August 31, 2025.

165.     According to the Q2 2026 10-Q, between the period September 1, 2025 and September 30, 2025, the Company purchased 1,197,396 shares of its own common stock at an average price of $30.98 per share, for a total cost to the Company of approximately $37,095,328.

166.     As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $24,414,904 for repurchases of its own common stock between September 1, 2025 and September 31, 2025.

167.    According to the Q3 2026 10-Q, between October 1, 2025 and October 31, 2025, the Company purchased 929,298 shares of its own common stocks at an average price of $28.81 per share, for a total cost to the Company of approximately $26,773,075.

168.    As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $16,931,810 for repurchases of its own common stock between October 1, 2025 and October 31, 2025.

169.    According to the Q3 2026 10-Q, between November 1, 2025 and November 30, 2025, the Company purchased 1,461,995 shares of its own common stock at an average price of $25.42 per share, for a total cost to the Company approximately $37,163,913.

170.    As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $21,681,386 for repurchases of its own common stock between November 1, 2025 and November 30, 2025.

171.    According to the Q3 2026 10-Q, between the period December 1, 2025 and December 31, 2025, the Company purchased 1,342,517 shares of its own common stock at an average price of $26.85 per share, for a total cost to the Company of approximately $36,046,581.

172.    As the Company's common stock was actually worth only $10.59 per share, the price at closing on February 9, 2026, the Company overpaid by approximately $21,829,326 for repurchases of its own common stock between December 1, 2025 and December 31, 2025

173.    Thus, the Company overpaid for repurchases of its own common stock by approximately $232.7 million between November 2024 and December 2025.

## DAMAGES TO KYNDRYL

174.    As a direct and proximate result of the Individual Defendants' conduct, Kyndryl will lose and expend many millions of dollars.

175. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

176. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

177. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

178. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including lucrative insider trading conducted by one of the Individual Defendants.

179. Furthermore, such losses include the Company's overpayment of approximately $232.7 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

180. As a direct and proximate result of the Individual Defendants' conduct, Kyndryl has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

181.    Plaintiff brings this action derivatively and for the benefit of Kyndryl to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Kyndryl, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

182.    Kyndryl is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

183.    Plaintiff is, and has been at all relevant times, a shareholder of Kyndryl. Plaintiff will adequately and fairly represent the interests of Kyndryl in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

184.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

185.    A pre-suit demand on the Board of Kyndryl is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following ten individuals: Defendants Schroeter, Caruso, Harris, Hester, Jackson, Kugel, Machuel, Merchant, Schreuder, and Ungerleider (the "Director Defendants"). Plaintiff needs only to allege demand futility as to five of the ten directors that were on the Board at the time of the filing of this complaint.

186.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the Cash Flow Metrics Misconduct, to make false, and misleading statements and omissions of material fact, and at the same time overpay by $232.7 million for repurchases of its own stock, all of which renders the

55

Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

187. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted Kyndryl to engage in the Cash Flow Metrics Misconduct and issue materially false and misleading statements. Specifically, the Director Defendants caused Kyndryl to issue false and misleading statements which were intended to make Kyndryl appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

188. Additional reasons that demand on Defendant Schroeter is futile follow. Defendant Schroeter has served as the Company's Chief Executive Officer and Chairman of the Board since 2021. As such, the Company provides Defendant Schroeter with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, he conducted little, if any oversight into the schemes to cause the Company to engage in the Cash Flow Metrics Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Schroeter also signed the false and misleading 2025 10-K filed during the Relevant Period. Additionally, Defendant Schroeter solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter*

*alia*, to re-elect Defendants Kugel, Machuel, and Merchant, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Schroeter is a defendant in the Securities Class Actions which have brought reputational and financial harm to the Company. For these reasons, Defendant Schroeter breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

189. Additional reasons that demand on Defendant Caruso is futile follow. Defendant Caruso has served as a Company director since 2021 and also serves as Chair of the Audit Committee. Defendant Caruso receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any oversight into the schemes to cause the Company to engage in the Cash Flow Metrics Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. During the Relevant Period, Defendant Caruso failed to correct the false and misleading statements alleged herein. Defendant Caruso also signed the false and misleading 2025 10-K through an attorney-in-fact. Additionally, Defendant Caruso solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Kugel, Machuel, and Merchant, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Caruso breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

190. Additional reasons that demand on Defendant Harris is futile follow. Defendant Harris has served as a Company director since 2021 and also serves on the Nominating and

Governance Committee. Defendant Harris receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any oversight into the schemes to cause the Company to engage in the Cash Flow Metrics Misconduct and to cause the company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. During the Relevant Period, Defendant Harris failed to correct the false and misleading statements alleged herein. Defendant Harris also signed the false and misleading 2025 10-K through an attorney-in-fact. Additionally, Defendant Harris solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Kugel, Machuel, and Merchant, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Harris breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

191.    Additional reasons that demand on Defendant Hester is futile follow. Defendant Hester has served as a Company director and Lead Independent Director since 2021. He also serves as Chair of Nominating and Governance Committee. Defendant Hester receives a sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any oversight into the schemes to cause the Company to engage in the Cash Flow Metrics Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. During the Relevant Period, Defendant Hester failed to correct the false and misleading statements alleged herein. Defendant

Hester also signed the false and misleading 2025 10-K through an attorney-in-fact. Additionally, Defendant Hester solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Kugel, Machuel, and Merchant, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Hester breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

192.    Additional reasons that demand on Defendant Jackson is futile follow. Defendant Jackson has served as a Company director since 2021 and also serves on the Nominating and Governance Committee. Defendant Jackson receives sizable compensation for her role as a Company director. As a trusted Company director, she conducted little, if any oversight into the schemes to cause the Company to engage in the Cash Flow Metrics Misconduct and to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. During the Relevant Period, Defendant Jackson failed to correct the false and misleading statements alleged herein. Defendant Jackson also signed the false and misleading 2025 10-K through an attorney-in-fact. Additionally, Defendant Jackson solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Kugel, Machuel, and Merchant, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Jackson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

193.    Additional reasons that demand on Defendant Kugel is futile follow. Defendant Kugel has served as a Company director since 2021 and also serves on the Compensation and Human Capital Committee. Defendant Kugel receives sizable compensation for her role as a Company director. As a trusted Company director, she conducted little, if any oversight into the schemes to cause the Company to engage in the Cash Flow Metrics Misconduct and to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. During the Relevant Period, Defendant Kugel failed to correct the false and misleading statements alleged herein. Defendant Kugel also signed the false and misleading 2025 10-K through an attorney-in-fact. Additionally, Defendant Kugel solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Machuel, Merchant, and herself to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Kugel breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

194.    Additional reasons that demand on Defendant Machuel is futile follow. Defendant Machuel has served as a Company director since 2021 and also serves on Audit Committee. Defendant Machuel receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any oversight into the schemes to cause the Company to engage in the Cash Flow Metrics Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect

corporate assets. During the Relevant Period, Defendant Machuel failed to correct the false and misleading statements alleged herein. Defendant Machuel also signed the false and misleading 2025 10-K through an attorney-in-fact. Additionally, Defendant Machuel solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Kugel, Merchant, and himself to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Machuel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

195. Additional reasons that demand on Defendant Merchant is futile follow. Defendant Merchant has served as a Company director since 2021 and also serves on Audit Committee. Defendant Merchant receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any oversight into the schemes to cause the Company to engage in the Cash Flow Metrics Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. During the Relevant Period, Defendant Merchant failed to correct the false and misleading statements alleged herein. Defendant Merchant also signed the false and misleading 2025 10-K through an attorney-in-fact. Additionally, Defendant Merchant solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Kugel, Machuel, and himself, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Merchant breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

196. Additional reasons that demand on Defendant Schreuder is futile follow. Defendant Schreuder has served as a Company director since 2021 and also serves as Chair of the Compensation and Human Capital Committee. Defendant Schreuder receives sizable compensation for her role as a Company director. As a trusted Company director, she conducted little, if any oversight into the schemes to cause the Company to engage in the Cash Flow Metrics Misconduct and to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. During the Relevant Period, Defendant Schreuder failed to correct the false and misleading statements alleged herein. Defendant Schreuder also signed the false and misleading 2025 10-K through an attorney-in-fact. Additionally, Defendant Schreuder solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Kugel, Machuel, and Merchant, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Schreuder breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

197. Additional reasons that demand on Defendant Ungerleider is futile follow. Defendant Ungerleider has served as a Company director since 2021 and also serves on Compensation and Human Capital Committee. Defendant Ungerleider receives sizable compensation for his role as a Company director. As a trusted Company director, he conducted little, if any oversight into the schemes to cause the Company to engage in the Cash Flow Metrics Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes,

and consciously disregarded his duties to protect corporate assets. During the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Ungerleider also signed the false and misleading 2025 10-K through an attorney-in-fact. Additionally, Defendant Ungerleider solicited the 2025 Proxy Statement which was materially false and misleading and resulted in the shareholders voting, *inter alia*, to re-elect Defendants Kugel, Machuel, and Merchant, to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Ungerleider breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

198.    Additional reasons that demand on the Board is futile follow.

199.    Defendants Caruso (as Chair), Machuel, and Merchant (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

200. In violation of the Code of Conduct, the Director Defendants engaged in or permitted the schemes to cause the Company to engage in the Cash Flow Metrics Misconduct and to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity; failing to avoid conflicts of interest; failing to ensure the Company's disclosures were accurate; failing to ensure the Company complied with applicable laws, rules, and regulations; and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

201. Kyndryl has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Kyndryl any part of the damages Kyndryl suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

202. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising

independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

203. The acts complained of herein constitute violations of fiduciary duties owed by Kyndryl's officers and directors, and these acts are incapable of ratification.

204. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Kyndryl. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Kyndryl, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

205. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Kyndryl to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

206.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Individual Defendants for Violations of**
**Section 20(a) of the Exchange Act**

207.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208.    The Individual Defendants, by virtue of their positions with Kyndryl and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Kyndryl and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Kyndryl to engage in the illegal conduct and practices complained of herein.

209.    Plaintiff, on behalf of Kyndryl, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Violations of**
**Section 10(b) and Rule 10b-5 of the Exchange Act**

210.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Kyndryl. Not only is Kyndryl now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Kyndryl by the Individual Defendants. With the price of its common stock trading at artificially inflated prices

66

due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Kyndryl.

212. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

213. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Kyndryl not misleading.

214. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Kyndryl.

215. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from

them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

216. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

217. Plaintiff, on behalf of Kyndryl, has no adequate remedy at law.

**THIRD CLAIM**
**Against Defendants Schroeter, Caruso, Harris, Hester, Jackson, Kugel, Machuel,**
**Merchant, Schreuder, and Ungerleider for Violations of**
**Section 14(a) of the Exchange Act**

218. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

219. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

220. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

221. Under the direction and watch of Defendants Schroeter, Caruso, Harris, Hester, Jackson, Kugel, Machuel, Merchant, Schreuder, and Ungerleider solicited the 2025 Proxy

Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

222. The 2025 Proxy Statement was also materially misleading because it failed to disclose that: (1) the Company's financial statements and free cash flow metrics were inaccurate; (2) the sustainability of the Company's financial growth was overstated; (3) the Individual Defendants caused the Company to engage in the Cash Flow Metrics Misconduct; (4) as a result, the Company's financial condition and prospects were materially worse than represented; (5) the Company lacked adequate internal controls; and (6) as a result of the foregoing, the Company would be unable to file its Form 10-Q for the period ended on December 31, 2025. As a result of the foregoing, Defendants Schroeter, Caruso, Harris, Hester, Jackson, Kugel, Machuel, Merchant, Schreuder, and Ungerleider caused the Company's public statements to be materially false and misleading at all relevant times.

223. Defendants Schroeter, Caruso, Harris, Hester, Jackson, Kugel, Machuel, Merchant, Schreuder, and Ungerleider knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to, the re-election of directors.

224. The false and misleading elements of the 2025 Proxy Statement led Company shareholders voted to, *inter alia*: (1) re-elect Defendants Kugel, Machuel, and Merchant to the Board for a one-year term, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of the Company's named executives; and (3) the ratification of the PwC as the Company's independent registered public accounting firm for the 2026 Fiscal Year.

225. The Company was damaged as a result of Defendant Schroeter's, Caruso's, Harris', Hester's, Jackson's, Kugel's, Machuel's, Merchant's, Schreuder's, and Ungerleider's material misrepresentations and omissions in the 2025 Proxy Statement.

226. Plaintiff, on behalf of Kyndryl, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

227. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Kyndryl's business and affairs.

229. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

230. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Kyndryl.

231. In breach of their fiduciary duties owed to Kyndryl, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and/or

omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's financial statements and free cash flow metrics were inaccurate; (2) the sustainability of the Company's financial growth was overstated; (3) the Individual Defendants caused the Company to engage in the Cash Flow Metrics Misconduct; (4) as a result, the Company's financial condition and prospects were materially worse than represented; (5) the Company lacked adequate internal controls; and (6) as a result of the foregoing, the Company would be unable to file its Form 10-Q for the period ended on December 31, 2025. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

232.    In further breach of their fiduciary duties, the Individual Defendants engaged in and/or caused the Company to engage in the Cash Flow Metrics Misconduct and failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

233.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate system of oversight, disclosure controls and procedures, and internal controls.

234.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $3.6 million.

235.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

236.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the Cash Flow Metrics Misconduct and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

237.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

238.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Kyndryl has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

239.    Plaintiff, on behalf of Kyndryl, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Unjust Enrichment

240.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

241.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Kyndryl.

242.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Kyndryl that was tied to the performance or artificially inflated valuation of Kyndryl or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

243.   Plaintiff, as a shareholder and a representative of Kyndryl, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

244.   Plaintiff, on behalf of Kyndryl, has no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Abuse of Control

245.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

246.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Kyndryl, for which they are legally responsible.

247.   As a direct and proximate result of the Individual Defendants' abuse of control, Kyndryl has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

248.   Plaintiff, on behalf of Kyndryl, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Individual Defendants for Gross Mismanagement

249.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Kyndryl in a manner consistent with the operations of a publicly held corporation.

251.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Kyndryl has sustained and will continue to sustain significant damages.

252.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

253.    Plaintiff, on behalf of Kyndryl, has no adequate remedy at law.

### EIGHTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

254.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

255.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

256.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

257.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Kyndryl to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

258.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

259.    Plaintiff, on behalf of Kyndryl, has no adequate remedy at law.

**NINETH CLAIM**
**Against Defendants Schroeter, Wyshner, and Khurana for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

260.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

261.    Kyndryl and Defendants Schroeter, Wyshner, and Khurana are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Schroeter's, Wyshner's, and Khurana's willful and/or reckless violations of their obligations as officers and/or directors of Kyndryl.

262.    Defendants Schroeter, Wyshner, and Khurana, because of their positions of control and authority as officers and/or directors of Kyndryl, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Kyndryl, including the wrongful acts complained of herein and in the Securities Class Actions.

263.    Accordingly, Defendants Schroeter, Wyshner, and Khurana are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

264.    As such, Kyndryl is entitled to receive all appropriate contribution or indemnification from Defendants Schroeter, Wyshner, and Khurana.

75

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Kyndryl, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Kyndryl;

(c)   Determining and awarding to Kyndryl the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Kyndryl and the Individual Defendants to take all necessary actions to reform and improve Kyndryl's corporate governance and internal procedures to comply with applicable laws and to protect Kyndryl and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Kyndryl to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding Kyndryl restitution from the Individual Defendants, and each of

76

them;

      (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: April 7, 2026              Respectfully Submitted,

                           **THE BROWN LAW FIRM, P.C.**

                           /s/*Timothy Brown*
                           Timothy Brown
                           Saadia Hashmi
                           Elizabeth Donohoe
                           Zachary Benson
                           767 Third Avenue, Suite 2501
                           New York, NY 10017
                           Telephone: (516) 922-5427
                           Facsimile: (516) 344-6204
                           Email: tbrown@thebrownlawfirm.net
                           Email: shashmi@thebrownlawfirm.net
                           Email: edonohoe@thebrownlawfirm.net
                           Email: zbenson@thebrownlawfirm.net

## **VERIFICATION**

I, Pratchi Roy, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of April 2026.

Signed by:

*Pratchi Roy*

7336CJ65CAFA4A5...

Pratchi Roy